BEAM, Circuit Judge,
concurring in part and dissenting in part.
I concur in the court’s reversal of the district court’s entry of summary judgment in favor of ACI and in the court’s collateral ruling that ACI continues to owe Churchill royalties accruing from all subli-censes granted prior to July 21, 2014. I dissent from the court’s holding that ACI validly terminated Churchill’s continuing interest in the Licensing Agreement on July 21, 2014.
I agree with the district court and Churchill that Churchill became a party to the Agreement in 2007 when, due to financial difficulties, Nestor entered into Amendment 4 of the Agreement with ACI and Churchill. At that time, Churchill acquired all of Nestor’s past, present and future technology-based royalty stream, and, at least by enforceable implication, Nestor’s prerogatives in the technology that generated such royalties. In addition, without question, Churchill gained the right to enforce the receipt of royalty assets due from past, present and future ACI-founded sublicenses.
Under the terms of Amendment 4, ACI acquiesced in this newly formed tripartite relationship and submitted sublicense royalty collections previously due Nestor di *584 rectly to Churchill. As a result, Churchill contends, correctly, that ACI, in its pleadings, concedes that Churchill became a party to the Licensing Agreement. Accordingly, subsequent to Amendment 4, the parties to the Licensing Agreement were Nestor, ACI and Churchill.
The court notes that in 2008, Nestor and ACI executed Amendment 5 through which Nestor transferred all of its rights in any “new” technology to ACI. Ante at 574-75. The court also correctly states, pursuant to Amendment 5, that “[n]otwith-standing this transfer ... Nestor had [in 2002] ‘irrevocably’ assigned all of its rights in the royalties to Churchill and that ‘Nestor no longer has any right, title or interest of any nature whatsoever in and to such royalties.’ ” Ante at 575. This amendment assignment had to have included royalties emanating from the use of the new technology as agreed upon at the outset of the Nestor-ACI relationship in 2001. So, subsequent to that point in time, and especially on July 21, 2014, the Licensing Agreement, as relevant to this action, was totally dedicated to the matter of royalties owed by one party to another party.
The, court mentions, but fails to adequately discuss, the implications surrounding Nestor becoming insolvent in 2009. At that time, the Rhode Island Superior Court appointed an insolvency receiver. The receiver, as authorized by the court, sold “all of Nestor’s [still continuing] rights in the Licensing Agreement and the licensed software technology to [ATS].” Ante at 575. Indeed, the Asset Purchase Agreement states that the assets were being sold “free and clear of all Liens.” Ante at 575. At that time, ATS was wholly substituted for Nestor as a party to the Licensing Agreement by action of the Rhode Island court which by law exercised exclusive jurisdiction over Nestor’s property. See Rhode Island General Laws § 7-1.2-1316(f). Thus, the parties to the Licensing Agreement at that time consisted of Churchill, ACI and ATS.
The court then observes that, “[u]nable to acquire the rights to the royalties [that were earlier irrevocably assigned as noted in Amendment 5] from Churchill, ACI instead purchased from ATS all of Nestor’s remaining rights, title, and interest in the licensed software technology and the Licensing Agreement on July 20, 2014.” Ante at 575. This purchase did not include any Nestor royalty rights because the receiver had none to sell. In any event, the parties to the Licensing Agreement then became ACI and Churchill. The next day ACI, armed with whatever rights it had earlier owned or had then been acquired from the receiver, unilaterally purported to execute a termination notice to Churchill, although with a later letter stating, “the license agreement, including the royalty obligations assigned to Churchill Lanes, is no longer in effect.” It appears that no specific contractually required reasons for a termination were ever advanced by ACI.
This purported termination notice was actually an attempted unilateral amendment of the Licensing Agreement and is so recognized by the court and both ACI and Churchill. See ante at 575 n.l. And, in this regard, the Agreement recognizes as the only grounds potentially applicable here for a termination of a “party” (1) becoming insolvent, (2) transferring of all its assets or (3) ceasing to conduct business. ACI’s cancellation of the License Agreement’s royalty obligations fully assigned to Churchill is not one of these applicable grounds for unilateral termination. Thus, ACI’s above-stated unilateral amendment attempt designed to obtain Nestor’s long since assigned royalty rights was ultra vires in the extreme.
To repeat, and as the court concedes, a unilateral termination could be bottomed *585 only on an allegation that the other party has become insolvent, transferred all of its assets, or has otherwise ceased to conduct business. Ante at 574. And, the record clearly establishes that Nestor, as Churchill correctly contends, was no longer a party to the Agreement at the time ACI rendered its termination notice. If, however, ACI somehow seeks to support a termination claim based upon Nestor’s rights and assets purchased from ATS, the License Agreement language and prior transactions between these existing parties to the Agreement clearly prohibit such a result.[3]
Section 9.3, the post-termination royalties- provision, provides that even after termination, ACI shall remain liable to Nestor for royalties with respect to sub-licenses granted by ACI prior to termination. Without question Churchill acquired all Nestor’s royalty rights well before ATS purchased any rights, title or interest from the receiver or before ACI purported to acquire them and render its specious termination notice.
Section 11.9 states this Agreement may be amended only by the consent of both parties. At this time, that would be ACI and Churchill. ACI’s purported termination notice is clearly a unilateral contract amendment and it seeks to function as such. And, as earlier noted, Churchill paid Nestor $3.1 million for all future royalties due Nestor under the Licensing Agreement and Churchill and Nestor entered into an agreement at that time whereby Nestor promised not to modify or terminate the Licensing Agreement without Churchill’s consent. Ante at 574-75. ACI’s purported termination based upon acquisition of ATS’s receivership purchases breach the underlying Agreement from which ACI now seeks to benefit.
Churchill is entitled to a calculable stream of licensing royalties emanating from Nestor, ACI and Churchill sources on and after July' 21, 2014. From the court’s contrary holding, I dissent.

. For instance, Section 9.2 of the termination provision states "[e]ither party may immediately terminate this Agreement ... if the other party ... becomes insolvent.” It is difficult to believe that ACI’s purported termination coming more than seven years subsequent to Nestor’s insolvency can be deemed either “immediate,” or equitable.